Good morning, Your Honors, and may I please report, David Harris on behalf of Outdoor Sports Gear, Inc., which for convenience sake I'll be referring to as OSG today. I'd like to reserve five minutes of my time both for rebuttal and to respond to ANS's cross-appeal. Your Honor, this appeal raises two contractual interpretation issues. First, there's the issue of whether under the terms of the party's 1996 Asset Purchase Agreement, the APA, whether OSG or ANS is liable for the injuries alleged in the Nash & Baeza lawsuits. The second question is whether and to what extent ANS was required under the terms of the APA to purchase insurance that would have covered the liabilities alleged in the Nash & Baeza lawsuits. Now, our position is that the District Court strayed from some very fundamental principles of contractual interpretation and as a result reached the wrong conclusion as to both issues. And today what I'd like to do is I'm going to go through and I'm going to discuss what we believe is the right outcome ultimately, but at the same time as I go through these issues, I'd like to highlight and emphasize what I'm going to refer to as the at a minimum errors. The errors that we believe are so fundamentally incorrect that at a minimum this Court should reverse the District Courts on certain issues to correct those at a minimum errors. So I'll with Section 2.03b3 of the parties contract. Now Section 2.03b3 stated that ANS agreed to assume liability for any and all injuries of any types regardless of when the underlying tort occurred so long as the injury itself quote unquote occurs after the time of closing, i.e. it occurs after 1996 when ANS purchased OSG's swimming pool business. Now the Court in interpreting this, the District Court, should have looked at the plain meaning of the words, particularly the word occur, and tried to determine what those words mean to an ordinary person. But the District Court never engaged in this analysis. Instead what the District Court did is it looked at a complicated California Court of Appeal decision called Armstrong. Now Armstrong dealt with a very specific issue of when standard CGL insurance policies are triggered for the purpose of asbestos-related coverage. And what the District Court did is it took the holding from Armstrong and effectively just superimposed it on top of the parties APA. See, what was wrong with that? That was the definition of when asbestos injury occurred as a matter of California law as of the time the contract was entered into. Well actually Armstrong came out after the parties entered into the APA, first of all. But second of all, I would argue that what Armstrong Court was deciding was not whether or not as a matter of law asbestos-related injuries occurred at a certain time. What it was deciding was as a matter of CGL policy. I recognize it involved CGL policies, but it also went through an in-depth analysis of what exactly is medically, medically when injury occurs when you come into contact with an asbestos-related injury. Was the Court of Appeal did? Yes, California Court of Appeal. Right. I agree that that was based on an extensive factual record. What we have here in this case is asbestos-related injuries, so why wouldn't that be the natural thing that the Court would look to? Well I think when you look at California case law, and frankly case law across the country, what you see is that courts continuously struggle to try to pinpoint when an asbestos-related injury quote-unquote occurs or when a cause of action accrues. And what the courts routinely say is that when it occurs depends upon the policy issues that are at play. No, no, no. In California, under California law, it occurs at the time of exposure to asbestos. Well, I think... Is this contract to be interpreted under California law? Yes, Your Honor. Okay. But I think if you look at cases like Buttram, Buttram is a California case, and in that case the Court rejected the idea that it occurred at the time of exposure and went with a later date for determining when an injury occurred. When is it that you say it occurred? Well, I think that... When the person realizes it? Well, I think that the question is a bit misleading, frankly. I think that when you're dealing with a contract, the question should be what did the parties mean when they said an injury occurred? I'm asking what you are contending the parties meant. Right. Our contention would be that an injury, whatever type of injury you're talking about, occurs to an ordinary person when the injured person starts experiencing symptoms of the injury. In other words, when they know they have the injury. That's correct. Now, what I would say... Even if there was some physical insult that set in course the chain of events that led to them realizing it at some earlier date. I believe that's correct. It's only when they realize it. Because the physical insult would be the cause, but not necessarily the injury. And if you look at the parties' contract in a 2.03b3, they're very careful to separate cause from effect. It would have been pretty easy to write this thing to say injury that were known prior to the closing or injuries that were known after the closing, right? It wasn't written that way. That's correct. It wasn't written that way. And I think what's important to realize is that it is written so that ANS is assuming liability for potential torts where the tortuous conduct occurred prior to closing and assuming liability for the future injuries from the prior occurring tortious conduct. Now, one thing that I think Your Honor's questions point us to is the fact that the district court actually got Armstrong wrong when it applied it. And this is one of the at a minimum errors I was referring to earlier. If you actually read... Well, the district court in its holding, it determined that Armstrong held it as a matter of California law, asbestos injuries occur at the time of exposure. The problem with that is if you actually read Armstrong, the Armstrong court expressly rejects the exposure theory of asbestos injuries. It says it does not believe that's the correct way to measure when an asbestos-related injury occurs. Instead, what the Armstrong court did is it adopted what's known as a continuous trigger theory. Now, under the continuous trigger theory, the court recognized that, yes, an injury occurs at the moment of exposure. However, new and additional injuries continue to occur over the life of the injury until the exposed person's death. Now, as a result, what the Armstrong court held is it's not just the CGL policy that was in place at the time of exposure that is triggered and needs to cover the asbestos-related injury. Rather, it is each and every CGL policy that was ever in place over the life of the disease that followed the exposure. So, as a result, a whole bunch of CGL policies were implicated, and they all had to share based upon the amount of time they were in effect. In effect, they had to share the coverage liability. Let me give you a hypothetical. Say someone goes to Afghanistan in 2010, and he or she witnesses terrible things. Fast forward nine years. He or she now suffers from PTSD. Would you say that PTSD injury occurred in 2010 or 2019? Well, I think it depends upon the party's contract, if there's a contract regarding it. If it's an injury, when did the injury occur? Well, I think under the terms of the APA, that would occur in, I forget the year, but I think the later date, 2019. And the reason I would say this, and I'd give you a hypothetical to explain why I would say this, is I think it's undisputable, looking at 2.03b3 of the APA, that if, for example, OSG had made inadequate concrete, it was faulty in some way, and they had paved a pool with this, and the concrete, after 30 years, deteriorates. And as a result, after the ANS purchased OSG's swimming pool business, someone around the edge of the pool, the concrete collapses underneath of them, they go into the pool, and they're injured in some way. I think that if you look at 2.03b3, it's indisputable that ANS would be liable for that injury, because as part of 2.03b3, what ANS agreed to was to agree to assume liability for defective products, for product liability issues. And if you're going to say that, if that's true, then it cannot be that the tortuous act is what triggers, the timing of the tortuous act is what triggers ANS's liability. I don't think anybody's arguing about timing of the tortuous act. It's when the injury happens. And the idea is that on these asbestos cases, the injury happens when the asbestos fibers get into the alveoli or whatever it is. Isn't that right? Right. Isn't that the theory? That's the theory. I mean, it's really not like the case you just described when we know when the injury happens, when the guy fell through the concrete. Right. I take Your Honor's point. I think, however, that an average person reading the language of OCCUR would think that it was when someone actually came down with symptoms. Would an average person have a clue? I mean, honestly, on this? I mean, really? Well, I mean, I think an average person knows what an injury is and knows what OCCURS is. But, you know, the other thing that I wonder about is, I mean, at the time, well before this time, the asbestos coverage litigation was going on across the country. Injury from asbestos and the type of injury that derives from asbestos was clearly known by then, even though it was hidden in the 50s. It was coming out. There were lawsuits all across the country. I know. I worked on the asbestos coverage insurance litigation representing two clients. Fortunately, we're out of it by the time of the Armstrong case. So, I'm just wondering. Oh, and also, it's clear that at a certain point, I don't know when exactly this happened, insurance companies just said, forget it, we're not covering asbestos-related injuries anymore because of the way you couldn't actually calculate your liability for asbestos injuries because a lot of people were exposed and didn't know when exactly any injuries or symptoms would occur, when, you know, death would occur, contracting any sort of symptoms and then connecting the symptoms to the actual disease. So, all this was going on at the time this contract was drafted. And I realize your point. This Armstrong Court of Appeals decision actually came out two months after you made your contract. But probably you weren't even involved in making this contract. I don't know. But certainly, the lower court decision had been there. And I misspoke. I represented an insurance company that was being sued by two of the asbestos insurance manufacturers that settled, that certainly by then, this was the particular risk and exposure about asbestos was no. Now, I just can't understand that this wasn't written. Knowing that was in mind, it's almost like the elephant in the room when you're talking about construction of swimming pools that used asbestos in the manufacturer. Well, I would point out that, at least to my knowledge, there's only been two, perhaps three allegations of asbestos-related illness related to these swimming pools. So, I don't know how common it is. But what I would like to go back to is the, you know, I think even if we agree, were to agree, which we don't, but if we were to agree that it was appropriate to look to Armstrong again, I would just emphasize that the court got that decision wrong when it declared that Armstrong held that injury occur at the time of exposure. The first injury occurs at the time of exposure under Armstrong. More injuries occur thereafter. And so, if we were to apply Armstrong in this case, what the district court should have held, and what makes some sense under Armstrong, if you're going to apply it, is that OSG is partially responsible, and so is ANS. That's a good point. That was a point I wanted to ask you about, but I was respecting your five minutes. What is your response to that? To that it should be shared? I mean, our response is that if you're going to follow Armstrong, and if we're going to hold that Armstrong is the law of the land in California, then I think that's where you have to come out, is you have to come out that OSG is liable for a portion of injuries that occurred from the time when they owned the business. ANS is responsible for the time after which they bought the business, and you would apportion it just as the Armstrong court did. I would also say, related to the liability issue, the second major error, I think, that the court made was with regard to the loss of consortium claims, and what the district court did is it just kind of grouped loss of consortium in with the asbestos-related injuries and said OSG is liable for all of it. Now, the problem with that is loss of consortium is an independent tort, and the case law is very clear, and I think just logically speaking it makes sense, that a loss of consortium doesn't occur necessarily at the same time as the injured spouse is injured. Rather, it occurs when the injured spouse's injuries make it so that that spouse can no longer fulfill its spousal functions. And here, that didn't occur in the 1970s or the 80s or the 90s or the 2000s. It occurred in the 2010s when Nash and Baeza were diagnosed with mesothelioma. So I think, to answer your question of where we come out on these issues, I would say that OSG comes out that at a minimum this court should reverse and hold that OSG and ANS are both liable for Nash and Baeza's personal injuries, but that ANS is solely liable for the loss of consortium that factually and legally had to have occurred in the 2010s. And is your argument that ANS should have gotten insurance for asbestos covered? That is one of our arguments, that under 10.07 they were required to purchase insurance that would cover any liabilities, which is very broad. Because I'm running out of time, I'll be very quick on this point. I think to go back to what is our minimum baseline position, as Your Honor asked, with regard to 10.07 and the insurances, what we believe is the most fundamental error there was that the district court changed the standard after trial. One standard was announced in the summary judgment order in which the court said, we're going to decide at trial whether asbestos coverage is, quote-unquote, available. After trial, the district court issued a trial ruling where it actually said the issue is not, as it had previously said, whether asbestos coverage was available, rather it's whether asbestos coverage was, quote, so widely available that it would have been unreasonable for an ANS to believe it didn't have to purchase it. Now, that's wrong for a whole host of reasons that we get into our briefs, but I think what's most fundamentally incorrect about that was that it changed the standard after the fact and made the trial unfair for OSG. All right. Thank you, Counsel. Thank you. Good morning, Your Honors. May it please the Court, William Adams for Anthony and Sylvan Pools. I'll start with the indemnification, Section 2.03 issue. The district court correctly interpreted the APA to create a bright line for allocation of liabilities based on when the injury occurs. Thus, OSG is responsible for injuries occurring before the closing time. An injury occurs when it happens or when it takes place. It does not occur when it manifests, when damage came into existence at the onset of symptoms. If the parties had intended that interpretation, that meaning, they would have used words like manifest, discovers, accrues, but they didn't. They used the plain and unambiguous term occurs, which means happens or takes place. What about this continuous injury thing that your opponent was talking about? Sure, Your Honor. Armstrong, in addition to determining that as a matter of California law that asbestos injuries first occur upon exposure, also adopted as a matter of policy something called the continuous trigger. That's an issue of insurance law, which is designed to ensure the maximum available insurance policies and insurance coverage for the insured. It has no applicability here into a contract between private parties. And, in fact, it would have the perverse result of actually making indemnification less available. So continuous trigger is intended to ensure that more insurance coverage is available to the insured. Applying that here would splice and dice indemnification, making it less available. But most importantly, there's nothing in the APA that suggests that you could adopt or read in a continuous trigger. It treats the occurrence of an injury as a singular, indivisible event. It doesn't contemplate a single injury being an assumed liability and also at the same time some portion of that injury being an excluded liability. So the continuous trigger, although not applicable here as a matter of policy at all, also isn't consistent with the party's contract. And it's undisputed, both as a matter of California law and on the record here, that all of the asbestos exposure, significant asbestos exposure, causes almost immediate harm and that all of that exposure occurred here before the closing time. If you look at ER 327 to 28, ER 434 and ER 487, that's in the record where you'll see that all of the exposure, the underlying exposure, occurred pre-closing. You take those undisputed facts, combine it with Armstrong, combine it with the plain interpretation of the word occurs, and you see that the district court was absolutely correct on summary judgment. For the wrongful death and loss of consortium claims, how could the injury have occurred pre-closing when someone's alive? How can a wrongful death claim accrue? Likewise, how can loss of consortium claim accrue in the 70s or 80s when the other spouse wasn't aware of these things and presumably was able to provide spousal company? Absolutely, Your Honor. So for purposes of interpreting the APA, the relevant personal injury in the loss of consortium context is the underlying asbestos-related injury. So if we look at ER 354, so that's the 2.03C3, it says that OSG is responsible for, quote-unquote, contingent liability for personal injury where the personal injury occurs before the closing time. The personal injury that occurred before the closing time is under Armstrong, the asbestos-related injuries, and the contingent liability is the loss of consortium claim. We know under California law... Basically you're saying it's out there even though we don't know about it, it's contingent. It's a contingent liability at the time of the injury arises. Under California law, the second spouse's loss of consortium claim arises from and has its origin in the first spouse's claim. That's the Warner case, 64, California App 3rd at 963. And also as a matter of California law, the loss of consortium claim is dependent on, which means contingent on, the existence of a valid primary cause of action. That's the Leonard case, 26, California App 4th at 1288. But for the wrongful death claim, that is stated specifically in Section 2.03, so that suggests that you can't rely on the contingent language or otherwise the wrongful death language in the contract would be superfluous. It would be our position, Your Honor, that if there is a personal injury that occurs before the closing that leads to death after the closing, that the parties intended for that wrongful death to be OSG's responsibility. We don't think it makes sense as a textual matter or as a logical matter to divorce the liability for the death for the liability from the injury because they're all arising out of the single act. Think, for example, Your Honor, let's say the closing time was in 1996. Say in 1995 there was a defective diving board that had been installed. Someone jumps off the diving board. They break their ankle. That injury is clearly pre-closing, but it leads to some sort of exacerbated condition. They get gangrene in 1996 and that's not treated and it leads to death after the closing. It wouldn't make any sense to say that death is somehow some sort of injury that's completely or event that's divorced from clearly what happened before. So it's our position that progressive conditions are you look to when the injury first occurred and the plain meaning of that would be that it occurred prior to the closing. I also want to address, I think, the Buttram case that my colleague mentioned. Buttram involves accrual of a cause of action for purposes of a tort reform statute. The word occurrence is what's in the APA and what Armstrong speaks to in California law. It's clear on that. And, of course, Armstrong, although arising or being decided right around the time of the APA, as Judge Wardlaw noted, the trial court decision, of course, was before that time, and Armstrong builds on the body of California law, including the Montrose decision from the California Supreme Court that preceded the execution of the APA. I'd like to turn briefly to the, if there are no further questions about the indemnification issue, I'll turn to the insurance coverage issue in Section 10.07. Here the issue for this court is whether the district court clearly erred in finding that Section 10.07 doesn't require asbestos-related coverage. I think it's very clear if you look at pages ER 5 and 6 that the district court properly found after bench trial no credible evidence that coverage for asbestos-related injuries was available in 1996. It's undisputed that Section 10.07 doesn't require coverage for all possible injuries because insurance policies have exclusions. Some are required by law. That's from our expert at SER 44. And the court thus determined that the dispositive issue here was whether, at the time of contracting, coverage for asbestos-related injuries was commercially available. OSG did not produce any contemporaneous insurance policies showing that asbestos coverage was available. As Judge Wardlaw noted, it was certainly even a decade earlier that exclusions for asbestos-related coverage became standard. And the party's experts didn't dispute that. SER 19 is the admission from OSG's expert that asbestos exclusions were standard by 1996. And there's also testimony from Anthony and Sylvan's expert at SER 30 and SER 37 to 35. And then the court expressly declined to credit OSG's testimony that there was a possibility for obtaining asbestos coverage in the specialty market. ER 5, the district court says it was completely speculative, Mr. Wayne's testimony, and he was not persuaded by it because he couldn't point to any specific asbestos coverage available in 1996. I really do commend the top paragraph on page ER 5 to the court's attention, where it provides a very persuasive credibility determination as to OSG's expert. That left, with no credible evidence of any asbestos availability in 1996, that left the expert testimony of Anthony and Sylvan's expert, who said he'd never seen an asbestos coverage in 1996. That's at SER 46 to 47. He said that asbestos isn't the type of risk that would normally be associated and available in the specialty market. That's at SER 50 to 51. And he said that Anthony and Sylvan lacked the bargaining power and the diversity of assets that would be necessary to get a manuscript policy. So for all those reasons, we think the district court was clearly correct and certainly not clearly erroneous to interpret Section 10.07 as he did. If there are no more questions on the OSG's appeal, I'll turn to Anthony and Sylvan's cross appeal. This is the indemnification issue in Section 12.01. Section 12.01 is an indemnification provision. It is not an attorney's fees provision. And the issue here under California law is whether there is any language that can be reasonably interpreted to provide for fees in a dispute between parties to a contract. And that's the standard from the district court and OSG's key case, that's ALCAI, for California Act 5th at 601, whether there's any language that can be reasonably construed to apply this provision to first-party actions. And there is abundant language contrary to the district court's conclusion. Subsection Romanet 4 is the relevant provision in 12.01, and it unambiguously entitles Anthony and Sylvan to attorney's fees incurred in this action as a component of compensatory damages. Okay, where does it clearly say that? All right, I'd like to – can I stop? And it's exactly where it clearly says that. Well, first off, under – I'm going to start with the premise, Your Honor, that there is no clear statement requirement to have an indemnification provision extend to – But there's nothing that says attorney's fees. Should there be the normal – I mean, the standard clause is something like, should there be any dispute arising from this contract, you know, the prevailing party will be entitled to attorney's fees or something. Well, Your Honor, that would be a prevailing party attorney's fees provision. This is an indemnification provision which provides attorney's fees as a form of compensatory damages. Where? Just tell me where. Sure, absolutely. So I'm on ER 393, and I'm looking at Section 12.01, a little Romanet 4. It's tucked in the middle there, and essentially – OSG shall indemnify Anthony and Sylvan with respect to any and all reasonable attorney's fees arising out of any failure of OSG to pay the excluded liabilities. And the excluded liabilities are what we discussed earlier, the underlying asbestos-related and loss-of-consortium claims. And that language is broad enough to include first-party actions. I do want to cite for the Court the Hot Rods case. That's 242 Cal App 4th at 1179, which makes clear that there is no clear statement requirement. You don't have to say the attorney's – So which fees are you referring to? Are you referring to fees in this litigation or fees in having to defend a lawsuit brought by a third party? Both. There is no dispute. The parties agree that the fees and the underlying actions, the third-party actions, are within this provision. The dispute – I would think that indemnification would contemplate that. Exactly, Your Honor. So the dispute is about the fees in this case. The dispute is about the fees in this case, whether – essentially what happened here is that because OSG did not step up and pay the excluded liabilities, that required Anthony and Sylvan to file this action to seek payment and recovery of those fees. In doing so, it incurred attorney's fees. And those attorney's fees arise out of – that's the contractual language – arise out of or are in connection with the failure to pay. There's nothing in that provision that precludes application to first-party actions. And there are other provisions in the APA within that provision that are expressly about third-party actions only. If you look at 12.01 Romanet III, that refers to indemnity for certain allegations by any third party. That provision is limited to third-party circumstances. Our Romanet IV doesn't have that limitation. And even more important, the district court's interpretation renders 12.05, which is at ER 395 to 96, entirely superfluous. That provision, 12.05, provides procedures for indemnifying a party – for the indemnifying party to control litigation, quote, in the case of any third-party claim as to which indemnification is sought. If this provision – if 12.01 was only talking about third-party claims and third-party actions alone, there would be no reason to have that provision. I would also commend to the court's attention the Zalkind case. This is exactly what happened in Zalkind. Zalkind interpreted a similar provision to imply the first party should seek recovery of fees in first-party actions, noting that elsewhere in the contract it had limited – it limited certain provisions to third-party actions. So by implication, certainly here, there's no limitation in Romanet IV to third-party actions. But doesn't 12.05 – it gives the right, the indemnifying person, to elect to conduct and control such action or suit. So all that does is saying the indemnified person can control the lawsuit, which isn't specifically addressed in 12.01. And when you look at 12.01, it starts off, seller shall indemnify and hold harmless. I mean, that language, you know, any business person who's done deals, that's almost a hallmark of third-party indemnification whenever you use the word indemnify and hold harmless. And if we're supposed to construe this in a reasonable way, I mean, that to me screams third-party indemnification, even if they didn't use the word third-party indemnification, because that's the rote language that's commonly used in business contracts. Well, the California Court of Appeal in both the Continental Heller and the Zalkind case interpreted indemnification provisions with exactly that language. But they had other language there in those contracts that aren't in here. They did, but the point being, Your Honor, that language is not dispositive, meaning that it's limited to third-party actions. And the Hot Rods case specifically says that where the provision and the context of the provisions can be read to include first-party actions, the court should do so, applying traditional principles of contractual interpretation. Also, Your Honor, you're correct that 12.05 does concern control of the litigation where there are third-party actions. But there would have been no reason to say in the case of any third-party claim, if everything in 12.01 was about a third-party claim, why there would be no reason to say in the case of any third-party claim. You'd just say in case of request for a matter subject to indemnification or in case of 12.01 indemnification request or notice under 12.01. By calling out the third-party claims there, that shows that certainly provisions of 12.01 aren't limited to them. And, I mean, we're under Romanet 4, but Romanets 1 and 2 are equally clear that they apply to breaches of reps and warranties and provisions that are between the parties that would only come up in a first-party action like this one. So, whereas we agree with the district court's interpretation of section 12.03 and 10.07, we respectfully disagree with the interpretation of the indemnification provision in 12.01. I know I'm over my time, so unless the court has any further questions, we ask you to reverse us on the cross-appeal but otherwise affirm. Thank you. And I'll give you three minutes because your colleague went over time, too. Your Honor was exactly right as to its questioning regarding isn't this just a standard indemnification provision and that's actually what California law holds. Well, how do you deal with Continental Heller? Continental Heller had languages virtually identical to what we're talking about here. Well, Continental Heller had one provision that was nearly identical, but then it had immediately following that a second additional provision. What's the second additional provision? The second additional provision, the first provision stated that the subcontractor would identify contractors from all damages including attorney's fees, which, quote, arise out of or is in any way connected with the performance of work under the subcontractor. You've got almost identical language in this contract. That's correct. But if you look at Continental Heller, what the court held was that provision staying alone was not sufficient to give rise to prevailing party attorney's fees. What else was needed? I'm sorry? What else was needed? What was needed was the second provision. The court noted that this provision was immediately followed by a provision that said, quote, and the subcontractor shall indemnify the contractor for attorney's fees suffered or incurred on account of any breach of the aforesaid obligations and covenants and any other provision or covenant of this contract. Don't you have that here, too? I don't believe so because I think what the court in Continental Heller was saying is we have a provision saying we'll pay your attorney's fees followed by another provision saying and we'll also pay your attorney's fees. And I think what the court was saying is you have to say it twice. Well, if you construe the first one as being for third party claims alone, then the second provision must be for something. So the court construed that as being for first party claims, particularly given how broad the language was. So the first provision that the court said in Continental Heller wasn't enough was that arises out of or connected with the performance of work under the subcontract. That wasn't enough. But then it relies on the second one that says indemnify and hold harmless fees, et cetera, on account of any breach of the aforesaid obligations and covenants and any other provision or covenant of this subcontract. I mean, aren't those effectively both in here, too? I don't think so. I don't think that there's the second provision there. If only the second provision were in this one, would that be enough? Because that's the one that Continental Heller said was sufficient. I don't believe that would be correct either. I think Continental Heller, the court, was very concerned with the fact that you had two provisions and that the court in that case did not want to render one of them superfluous or meaningless. And since they were back-to-back and they seemed to be directed towards similar things, the court was trying to find a way to harmonize them and give effect to both of them. And I think if you look at al-Qaeda partners, what you find is that the general rule in California these days is that the default is that if you have a provision that's labeled indemnification, talks about one party indemnifying the other, talks about one party holding the other harmless, the default rule is to assume that that provision is preferring the third party indemnification, not prevailing party attorney's fees. And the courts are not supposed to go in and try to infer a prevailing party attorney's fees clause into an indemnification provision unless that prevailing party attorney's fees clause is specifically stated. And one other thing I'd like to point out is I think the line that my colleague is trying to draw between indemnity provisions and prevailing party attorney's fees provisions is not a correct line to draw. The case law states, and I would direct the court to Baldwin Builders 125 Cal App 41339, and in that case what the court holds is that when you have an indemnification provision that includes attorney's fees for the parties in a direct action on the contract, that that attorney's fees provision is subject to Section 1717 of the California Civil Code. In other words, it's interpreted just like a prevailing party attorney's fees clause. And so I think that you have to recognize that since that applies, then the contract for prevailing party fees attorneys needs to be specifically provided in the contract. All right. Thank you very much, Counsel. Thank you. Anthony and Sylvan Polz v. Outdoor Sports Gear will be submitted.
judges: Wardlaw, Kennelly, Lee